Lawrence J. MEROVKA, L. J. Dugger, and Robert G. Kinghorn, Appellants,

v.

Renwick L. ALLEN and Courtney Vallentine, Appellees.

No. 10142.

United States Court of Appeals
Tenth Circuit.

May 20, 1969.

Robert M. Perry, Atty., Dept. of Justice (Clyde O. Martz, Asst. Atty. Gen., John Quinn, U. S. Atty., Ruth C. Streeter, Asst. U. S. Atty., Roger P. Marquis, Atty., Dept. of Justice, with him on the brief), for appellants.

O. R. Adams, Jr., Albuquerque, N. M., for appellees.

Before MURRAH, Chief Judge, and HILL, and SETH, Circuit Judges.

SETH, Circuit Judge.

The basic facts in the case are described in the opinion in No. 9330, 382 F.2d 589, when the case was here before on an appeal from a summary judgment.

The appellees own a small tract of land which is surrounded on three sides by a small state waterfowl refuge. Appellees had been having a dispute with the state game authorities over the years concerning the right to hunt on this tract of land, and this was the subject of protracted litigation between the owners and the state game officials.

The trial judge on the first hearing dismissed the appellees' complaint apparently on the ground that the existing federal regulations concerning the "baiting" of waterfowl were applicable. In the first opinion we held these were not applicable and sent the case back for trial. It was tried and the jury found for the plaintiff landowners and judgment was entered against the federal game officials for actual and punitive damages, and they have taken this appeal.

The record shows that the defendant officials had complete knowledge of the activities being carried on by the state of New Mexico on the refuge, they knew the boundary between the refuge and the private land, and they were familiar with the area which was privately owned and upon which the plaintiffs sought to hunt. The state had planted crops of corn, maize, and other grains upon the refuge and apparently in several areas very close to the dividing line between the refuge and the land in question. These crops were raised for the purpose of feeding waterfowl, and in the fall the mature grain would be cut or knocked to the ground so it would serve to feed the wild ducks and geese. The federal officials had visited the location a number of times and, as indicated above, were familiar with all the state was doing and what the landowners were doing. The record shows that the federal government participated in the feeding on other portions of the refuge but apparently not on this particular tract. The federal officials testified as to the growing of the grain, and that it was knocked down for the benefit of the waterfowl and not for the benefit of any hunters. The record is also clear that the private tract

in question had no feed upon it for waterfowl either growing naturally or having been placed thereon. The federal officials testified that it had just a few trees on it, and the rest was "cockleburs and Russian thistles." The tract of private land was located between the river which was used by the waterfowl and the state refuge; consequently the birds would fly back and forth to feed on the grain which had been grown for them on the refuge. All of the federal officials involved knew of these facts including the Regional Director of the Bureau of Sports, Fisheries and Wildlife who had been consulted about the matter.

Defendant officials stated that the circumstances were in their opinion proper for the application of the federal regulation concerning the baiting of waterfowl (50 C.F.R. § 10.3(b) (9)); see also 16 U.S.C. § 704.[1]

The record also shows that the regulation concerning baiting had been changed some time before this incident and there had been removed from the regulation provisions which stated that a baiting violation could occur no matter who had placed the bait and no matter what the distance was between the bait and the hunter. The defendant officials testified they were familiar with the change in the regulation. The defendant Merovka, a federal official, also testified he was familiar with the departmental bulletin which stated that growing crops were in a different category and did not necessarily create a condition which would constitute baiting.[2]

This bulletin also contains a provision relating to the "artificial manipulation of crops." The federal officials throughout their testimony at the trial of this case referred to the state's acts in cutting the grain and leaving it on the ground as being a "manipulation."

As to the purpose of the federal posting of the appellees' land, the defendant Dugger testified:

"Q. Speaking of you, Mr. Dugger, and Mr. Kinghorn, and Mr. Merovka, what did you consider to be the primary harm that would be done if hunting were allowed on the plaintiffs' property?

"A. I can't speak for Mr. Merovka or Mr. Kinghorn, but I would have considered that I—I consider that it would have negated the area's value as an inviolate sanctuary if it was hunted there. It would disburse birds to

1. "§ 10.3 Hunting methods.
　　　*　　*　　*　　*　　*

"(b) *Prohibitive methods.* Migratory game birds may not be taken:
　　　*　　*　　*　　*　　*

"(9) By the aid of baiting, or on or over any baited area. As used in this subparagraph, 'baiting' shall mean the placing, exposing, depositing, distributing, or scattering of shelled, shucked, or unshucked corn, wheat or other grain, salt or other feed so as to constitute for such birds a lure, attraction, or enticement to, on or over any area where hunters are attempting to take them; and 'baited area' means any area where shelled, shucked, or unshucked corn, wheat or other grain, salt or other feed whatsoever capable of luring, attracting, or enticing such birds is directly or indirectly placed, exposed, deposited, distributed, or scattered * * *."

2. "The feeding of waterfowl through a planting program is a recognized practice of waterfowl management. When one constructs a pond, grows a stand of millet, or floods crop lands, he does so with the expectation that before, during and after the season birds will use the feed thus produced and will remain for extended periods in the general area. Unless these crops are artificially manipulated to enhance hunting opportunity, it is permissible to shoot over them. The luring effect of these crops is so dissipated that there is no comparison between the results of hunting over them as compared to hunting in close proximity to bait put out by hand in such a manner as to attract birds to the exact location of the hunter. In the first instance, the birds are scattered over a larger area where they feed at will. In the second instance, they are enticed to a rather small, well-defined area where they can readily be shot." (The above is a portion of the Departmental Bulletin of November 15, 1959—Conservation Backgrounds —The History of Anti-Baiting Regulations).

points where they would have been vulnerable to hunters, other hunters.

"Q. And it would have caused birds to go away from the area, then?

"A. In my opinion it would have."

The officials in the subsequent hearing retreated somewhat from that position, but the defendant Dugger again testified as follows:

"Q. Mr. Dugger, haven't you previously testified that you were concerned about the area being harmed as an inviolate sanctuary for birds?

"A. Counsel, I believe you asked me a question what the result would be if hunting was allowed on there one time and I indicated that the birds would be disbursed.

"Q. And it would no longer be an inviolate sanctuary; didn't you use those words?

"A. I quite likely did. If people were allowed to hunt there it couldn't be an inviolate sanctuary."

It is a reasonable conclusion to draw from the testimony that the federal officials took the actions they did in order to assist the state officials to prevent the plaintiffs from hunting on the land adjacent to the state refuge, and not in a bona fide application of federal regulations. The cooperation between the state and federal officials in seeking to prevent this hunting is evidenced by the record. The defendant Kinghorn for example testified:

"Q. (Mr. Adams continuing) And each time in the two years that you posted it, right before you posted it you had been informed that the state officers were restrained, had you not, Mr. Kinghorn?

"A. Yes, sir."

The defendant Dugger testified as to the time when the signs were placed on the premises of appellees that he knew that the state officials had been restrained from interfering with hunting on the land. It is also apparent from the timing of the acts of the officials that they had been closely cooperating. One of the defendants testified that the second time the state officials (that is, in 1965) discussed the matter with the federal officials, they posted the land again. The defendant Kinghorn who actually placed the sign on the premises testified that when he put it up in 1963, he knew the state officers had been restrained from interfering with appellees' hunting on their land. The supervisory officials also knew of the restraining orders issued against the state officers when they instructed their subordinates to post the premises. The regional official who was not a defendant testified as follows:

"Q. The question was, sir: When the State could prevent them, then you didn't bother them, did you?

"A. Ask that again, sir.

"Q. When the State could prevent the hunting there, you didn't bother the plaintiffs, did you?

"A. No, sir.

"Q. And when the State couldn't, then you posted it, didn't you, sir?

"A. Yes, sir."

This official also testified that there was no need to post when the state officials were not restrained.

As indicated above, the timing of the acts gives further indication that the federal officials were attempting to prevent hunting on the tract in a manner to circumvent the state court orders. For example, the record shows that in one year the property was posted the day following the day upon which an injunction had issued against the state officers. Further the record shows that a proceeding was filed against the federal officials and a hearing was held some three or four hours after the filing of the proceedings, and there were present at this hearing state officers to observe the proceedings.

It is thus apparent that the defendants took the actions they did in order to assist the state officers in a protection of the small game refuge contrary to the decisions of the state courts, and

attempted to cover the situation at all times when the state officers were restrained from acting. In so doing they improperly attempted to use the federal baiting regulation which was clearly inapplicable.

The record shows that there was hunting in areas adjacent to the refuge boundaries of the nearby big Belen refuge, and that this was available for hunting apparently by all interested hunters. One of the defendants testified that the state game officials also hunted in these areas, and they and the hunters killed game when the geese and ducks were going on the big refuge to feed.

The record shows that the defendants made every attempt to prevent the use of the plaintiffs' property for hunting, and that in so doing they intentionally misapplied the federal regulations relating to baiting. Improper motives are evidenced by the record, and it is not a question of a good faith erroneous interpretation of the regulations, but instead a deliberate attempt to misapply them to prevent the plaintiffs from using their property for hunting.

The circumstances show that the defendants were so acting beyond the scope of their authority and they were and are not immune from suit. The circumstances thus show their liability for interference in the use of the plaintiffs' property and in the trespass. The trial court was thus correct in this aspect of the case.

As indicated above, the jury found a verdict for actual and punitive damages in a substantial amount. From an examination of the proof of actual damages submitted at the trial, it must be concluded that it was speculative and was not related to any conditions or facts upon which the jury could properly determine the damages. The testimony consisted of the general experience of one of the plaintiffs over his many years of hunting in New Mexico and in Nebraska without the benefit of any particular instances or facts. The objec-

tions of the government to this testimony should have been upheld. Also on the issue of damages we must reverse on the trial court's instruction relating to "conspiracy." This instruction prejudiced the jury as to the issue of damages and presented conspiracy as a separate issue or cause for damages. See Koblitz v. Baltimore & Ohio R.R., 266 F.2d 320 (2d Cir. 1959). The matter of improper cooperation between the state and federal officials should have been, and was, considered by the court, as indicated above, on the scope of authority issue, but it was error to give an instruction on "conspiracy" in a criminal form as a separate issue.

The trial court was thus correct on the liability issue but was in error as to the damage issues. Reversed and remanded for the proper determination of damages.